IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNION PACIFIC RAILROAD COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | 8:08CV336 |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, and JANET A. NAPOLITANO, in her official capacity, | ) ) ) ) | MEMORANDUM AND ORDER |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the court on the defendants' motion to dismiss, Filing No. 34 and the defendants' motion to suspend briefing on the plaintiff's motion for summary judgment (Filing No. 61). This is an action for declaratory and injunctive relief pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, et seq. The plaintiff, Union Pacific Railroad Company ("UP"), seeks relief from the imposition of substantial penalties and the seizures of several rail cars by defendants (collectively, "the Government" or "Homeland Security") because illegal narcotics were found in railcars upon entry to the United States. In its complaint, UP asserts that Homeland Security, through United States Customs and Border Protection ("CBP") has issued numerous penalty notices and assessed penalties of more than 37 million dollars against UP for purported violations of the Tariff Act of 1930, 19 U.S.C. § I584(a) ("the Tariff Act"). *See* Filing No.1, Complaint, Ex. A. The penalties were assessed as the result of controlled substances aboard trains bound to the United States from Mexico that were inspected by CBP at Calexico, California, and Brownsville, Texas. UP contends that the imposition of penalties and

seizures of railcars at issue were final agency actions under the APA and asks that the Court set aside the actions as "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" under the APA.  UP challenges the CBP's interpretation of the Tariff Act and contends that the government's actions arbitrarily deprive it of its property in violation of its Fifth Amendment rights to due process and violate the "excessive fines" clause of the Eighth Amendment.  Jurisdiction is premised on 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1346 (jurisdiction over cases with the United States as defendant).  UP further contends that jurisdiction is proper under the Administrative Procedure Act, 5 U.S.C. § 702, *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

The Government moves to dismiss for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1) and for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  It asserts that this court lacks subject matter jurisdiction because there has been no showing that the United States has waived sovereign immunity to suit and because UP has not exhausted administrative remedies under the APA.  It argues that UP has an adequate remedy in statutory mechanisms for obtaining judicial relief from forfeiture or in eventual collection proceedings.  It also contends that Counts III and IV of UP's complaint fail to state a claim for a substantive due process violation or for violation of the Eighth Amendment's excessive fines clause.  The Government further argues that the court should exercise its discretion to decline jurisdiction under the Declaratory Judgment Act.  Alternatively, it seeks transfer to the Southern District of Texas or to the District of Arizona.

2

**FACTS**

The materials submitted in support of and in opposition to the motion show that the dispute between the parties involves Homeland Security's assessment of penalties on UP as the result of the discovery of narcotics in railcars crossing the border into the U.S. from Mexico. The sanctions were imposed pursuant to 19 U.S.C. § 1584(a), which makes the "master of any vessel and any person in charge of a vehicle bound to the United States" liable for certain penalties if there is no manifest for goods coming into the country or they are improperly manifested. With respect to illegal narcotics, the master or owner of a vessel used by a person as a common carrier is not liable under the statute if "it appears to the satisfaction of the court that neither the master nor any of the officers (including licensed and unlicensed officers and petty officers) nor the owner of the vessel knew, and could not, by the exercise of the highest degree of care and diligence, have known, that such narcotic drugs were on board." 19 U.S.C. § 1584(a)(2).

In its complaint, UP alleges that in it entered into the Land Border Carrier Initiative Program Agreement ("LBCIP Agreement") in 1998. That agreement requires carriers to take a number of measures in foreign facilities under their control or operation. UP alleges that it has no such facilities. The LBCIP Agreement does not require UP to establish security at or conduct inspections of foreign facilities that are not under UP's control. UP owns no railroad operating facilities in Mexico and has no railroad operating employees there. It does not hire, supervise, or in any way direct the individuals involved in any Mexican operators' terminal and switching operations and has no control over the trains until after their arrival in the United States and their inspection by CBP. CBP did not notify UP that UP's efforts to comply with the agreement were unsatisfactory. UP has voluntarily

3

participated in numerous voluntary efforts involving drug interdiction. UP also participates in the CBP's Customs-Trade Partnership Against Terrorism (C-TPAT) program. UP further alleges that all but one of the seizures at issue involve railcars operated by Ferrocarrill Mexicano, S.A. de C.V. ("Ferromex" or "FXE") and that UP has a 26% ownership interest in FXE and cannot compel FXE to undertake inspections or take other actions in Mexico to prevent drug smuggling.

UP further alleges that rail cars are routinely "interchanged" between railroads in both international and domestic movements. In a domestic interchange, the receiving railroad takes custody and possession of the car and generally becomes responsible for damage to the car occurring while in its possession. At the Mexican border, the Mexican railroad delivers trains to CBP's exclusive control for inspection before in-bound trains are released to the domestic railroad. UP and its employees gain access to the trains entering the U.S. at the Mexican border only after CBP concludes its inspection, seizes any illegal drugs found on board, and releases the cars in the train to UP.

In 2003, UP entered into an "standstill" agreement with CBP wherein UP agreed to participate in efforts to combat drug smuggling from Mexico and CBP agreed to hold all drug-related penalties in abeyance. *See* Filing No. 60, Index of Evid., Declaration of Carroll P. Burri (CM/ECF 60-1), Ex. A, correspondence dated August 11, 2003, from CBP to UP (CM/ECF 60-2); Ex. B, correspondence from UP to CBP (CM/ECF 60-3). In correspondence to CBP in May of 2007, UP managers expressed surprise and disappointment at CBP's apparent renunciation of the agreement, in spite of the fact that continuing collective efforts had demonstrated a positive result. *Id.*, Ex. C, correspondence dated May 21, 2007, from UP to CBP (CM/ECF 60-4). On December 7, 2007, CBP wrote

4

to UP acknowledging the positive results, but stating that "more stringent security measures are needed to effectively secure UPR's conveyances from being utilized by criminals who could also be terrorists." *Id.*, Ex. D, correspondence dated December 7, 2007 (CM/ECF 60-5). The letter noted that "four years is a reasonable amount of time to allow [UP] to strengthen its security protocols" and stated that the CBP would thereafter direct its officers to issue drug-related penalties under 19 U.S.C. § 1584 on UP for subsequent drug seizures. *Id.* With respect to the penalties that had been held in abeyance for seizures between 2003 and 2007, the CBP stated that it would review the cases with the Office of Regulations and Rulings. *Id.* UP's Chairman, Jim Young, wrote to Department of Homeland Security Secretary Michael Chertoff in February of 2008, expressing his understanding that "CBP believes that Union Pacific, which owns 26 percent of the stock of Ferromex as an investment, can force Ferromex to interdict drugs within Mexico," and indicating that "CBP also suggests that Union Pacific should enter Mexico to inspect rail cars using Union Pacific's own police force." *Id.*, Ex. E, correspondence dated February 19, 2008 (CM/ECF 60-6). UP stated that CBP's position was unreasonable. *Id.* In response, CBP stated that it would issue specific instructions to its field offices to give every legal consideration to mitigate the narcotics-related penalties to the lowest amount, and would consider the penalty offset mechanism so that UP could invest the penalty amount into enhanced security measures, but did not address UP's arguments regarding the interpretation of the statutes and regulations or its contention that it was not possible for UP to inspect the cars in Mexico. *Id.* Ex. F, correspondence dated March 13, 2008

(CM/ECF 60-7). UP continued to attempt to resolve the dispute. *Id.*, Exs. G-J, e-mails (CM/ECF 60-8 -60-11).

UP challenged the CBP actions by filing petitions to mitigate or rescind the penalties, arguing that it was not liable for the illegal drugs found on the trains because it was not the master of, nor in control of, the vehicles. *See* Filing No. 36, Index of Evidence, Declaration of Carmen Dominguez at 3 (CM/ECF 36-2). CBP issued mitigation decisions reducing the amount of the penalties, but failing to address UP's contention that UP was not liable under § 1584. *Id.* at 3*; see, e.g.*, Ex. 2, correspondence dated July 8, 2008 (CM/ECF 36-4). CBP determined that UP had failed to exercise the "highest degree of care and diligence," contending that "it is incumbent upon [UP] to ensure that railcars are inspected in Mexico prior to crossing the border." *See, e.g.*, Filing No. 1, Complaint, Ex. B, Penalty Notice at 2-3 (CM/ECF 1-2). UP filed petitions for reconsideration of the first twelve penalties and CBP denied each petition and ordered UP to pay the mitigated penalties in order to prevent collection action for the full assessed penalty. *See, e.g.*, Filing No. 58, Index of Evid., Burri Decl. (CM/ECF 58-1), attached Ex. 1, administrative case record (CM/ECF 58-2) at 17-26; Ex. 12, administrative case record (CM/ECF 58-13) at 7-40; *see also* Exs. 2-11 & 13-17, administrative case records (CM/ECF 58-2 to 58-11, 58-13 to 58-17).

Between March and June 2008, CBP seized six railcars at the border pursuant to authority granted in 19 U.S.C. § 1595a.[1] Filing No. 58, Ex. 14, case record (CM/ECF 58-

---

[1] That section provides for the forfeiture of any vessel used in the importation of any article introduced or attempted to be introduced in violation of law, including controlled substances. 19 U.S.C. § 1595a(a) & (c)(1)(B). The section further provides that the penalty for aiding unlawful importation for "[e]very person who directs, assists financially or otherwise, or is in any way concerned in any unlawful activity mentioned in the preceding subsection shall be liable to a penalty equal to the value of the article or articles introduced or attempted to be introduced." 19 U.S.C. § 1595a (2008).

15) at 1; Ex. 15, case record (CM/ECF 58-16) at 1; Ex. 16, case record (CM/ECF 58-17) at 1; Ex. 17, case record (CM/ECF 58-18) at 1.  UP filed mitigation petitions for release of the railcars, again arguing that seizure and forfeiture of the rail cars was impermissible under 19 U.S.C. § 1594(c), which prohibits seizure where a common carrier did not know that illegal drugs were on board and could not, "by the exercise of the highest degree of care and diligence," have known that the illegal drugs were on board.  Filing No. 58, Ex. 14 at 15-16; Ex. 15 at 18-20; Ex. 16 at 13-15; Ex. 17 at 13-15.  CBP then agreed to release two of the railcars upon payment of storage charges and the execution of a broad release by UP, and stated it would release the others upon payment of penalties totaling five percent of the railcars' value and execution of a broad release, and further stated that the rail cars would be disposed of through forfeiture proceedings if UP did not pay the penalties within 30 days.  *See* Filing No. 58, Ex. 14 at 26 and Ex. 15 at 30; Ex. 16 at 33, Ex. 17 at 35; *see also, e.g.,* Filing No. 36, Index of Evid., Dominguez Decl., Ex. 2 at 1,3,5,7. UP refused to pay the mitigated penalties, arguing that such acceptance would have amounted to a waiver of UP's legal defenses because the regulations provide that acceptance and payment of a mitigated penalty is an accord and satisfaction of the Government's claim.  Filing No. 69, Amended Brief at 5.  After receiving the notices, UP filed this declaratory judgment action and later submitted claims and posted bonds to ensure that the railcars were not sold at auction.  *See* Filing No. 58, Index of Evid., Burri Decl., Ex. 14 at 31-35, Ex. 15 at 33-37, Ex. 16 at 35-38 and Ex. 17 at 37-41.  After UP filed this action, the Government referred 38 administrative cases to the attorney general and filed actions in California, Texas, and Arizona to enforce the penalties and obtain forfeiture

of the railcars.[2]  *See* Filing No. 73, Reply Brief at 6, 8; Filing No. 63, Index of Evid., Affidavit

of William M. Lamson, Exs. A & B, pleadings in *United States v. Union Pacific Railroad*

*Company*, Case No. 09 CV 0539 (S.D. Cal.).

## DISCUSSION

*Law*

1.    Fed. R. Civ. P. 12 (b)(1)

a.    Standard of review

Because jurisdiction is a threshold issue for the court, the district court has broader

power to decide its own right to hear the case than it has when the merits of the case are

reached. *Bellecourt v. United States*, 994 F.2d 427, 430 (8th Cir.1993).  For the court to

dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure

12(b)(1), the complaint must be successfully challenged either on its face or on the factual

truthfulness of its averments.  *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993).  In a facial

challenge to jurisdiction, all of the factual allegations regarding jurisdiction would be

presumed true and the motion could succeed only if the plaintiff had failed to allege an

---

[2]In its amended brief, UP asserts that since the filing of the complaint in this matter, CBP has assessed additional penalties of $23.5 million and seized 18 additional railcars.  *See* Filing No. 69, amended brief at 1 n.1.  The Government has filed enforcement actions in the Southern District of Texas and the Southern District of California.  *See United States v. Union Pacific*, Case No. 09-CV-71 (S.D. Tex. March 17, 2009); *United States v. Union Pacific*, No. 09-CV-0539 (S.D. Cal. March 18, 2009).  It is also pursuing *in rem* forfeiture actions against ten seized railcars in the District of Arizona.  *See United States v. One Covered Grain Hopper Railcar Bearing Identification Number UP90387*, No. 09-CV-151 (D. Ariz. March 19, 2009); *United States v. One Cement Hopper Railcar Bearing Identification Number MKT00562*, No. 09-CV-152 (D. Ariz. March 19, 2009); *United States v. One Grain Hopper Railcar Bearing Identification Number S00125074*, No. 09-CV-153 (D. Ariz. Mar. 19, 2009); *United States v. One Railroad Box Car Bearing Identification No. MDW9012*, No. CV 09-154 (D. Ariz. Mar. 19, 2009); *United States v. One Railroad Box Car Bearing Identification Number MDW9078, One RailroadBox Car Bearing Identification Number MDW9087*, No. 09-CV-155 (D. Ariz. Mar. 19, 2009); *United States v. One Grain Hopper Railcar Bearing Identification Number CEFX635426*, No. 09-CV-156 (D. Ariz. Mar. 19, 2009); *United States v. One Railroad Box Car Bearing Identification Number BNSF760436*, No. 09-CV-157 (D. Ariz. March 19, 2009); *United States v. One Grain Hopper Railcar Bearing Identification Number MWTX212698*, No. 09-CV-158 (D. Ariz. Mar. 19, 2009); and *United States v. One Grain Hopper Railcar Bearing Identification Number FCTX529*, No. 09-CV-159 (D. Ariz. March 19, 2009).

element necessary for subject matter jurisdiction. *Id.* In a factual attack on the jurisdictional allegations of the complaint, however, the court can consider competent evidence such as affidavits, deposition testimony, and the like in order to determine the factual dispute. *Id.* Arguments that a plaintiff has failed to exhaust administrative remedies raises a factual challenge to the court's jurisdiction. *See Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007). In such a challenge, the court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Osborn v. United States*, 918 F.2d 724, 729 (8th Cir. 1990). No presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the court from evaluating for itself the merits of jurisdictional claims. *Id.* The plaintiff has the burden of proving that jurisdiction does in fact exist. *Id.* at 730.

          b.    Subject Matter Jurisdiction

Although the APA provides for judicial review of the final actions taken by federal agencies, it is not an implied grant of subject matter jurisdiction. *Califano v. Sanders*, 430 U.S. 99, 105 (1977); *see also Ochoa v. Holder*, 604 F.3d 546, 549 (8th Cir. 2010) (The APA is not an independent jurisdictional provision; it is a procedural statute that provides no substantive requirements but merely provides the framework for judicial review of agency action); 5 U.S.C. § 704. Similarly, the Declaratory Judgment Act does not enlarge the jurisdiction of the federal courts; it is "procedural only." *Vaden v. Discover Bank*, 129 S. Ct. 1262, 1278 n.19 (2009).

However, the general federal-question jurisdiction statute, 28 U.S.C. § 1331, as amended in 1976 to eliminate the requirement of a certain amount in controversy, operates to "confer jurisdiction on federal courts to review agency action regardless of whether the APA of its own force may serve as a jurisdictional predicate." *Califano v. Sanders*, 430

9

U.S. at 105*; see e.g., Willis v. United States*, 787 F.2d 1089, 1093 (7th Cir. 1986) (holding that when claims rest on Constitutional rights, subject matter jurisdiction arises from 28 U.S.C. § 1331); *see also Nippon Miniature Bearing Corp. v. Weise*, 230 F.3d 1131, 1138 (9th Cir. 2000) (holding that a challenge to the legality of a forfeiture and penalty assessed by Customs Service invoked federal question jurisdiction under § 1331).  Under 28 U.S.C. § 1331, federal courts have original jurisdiction over all civil actions arising under the Constitution, laws, or treaties of the United States.  *Allen v. United States Air Force*, 603 F.3d 423 (8th Cir. 2010).  Furthermore, the district courts have original jurisdiction over "any action or proceeding for the recovery or enforcement of any fine, penalty, or forfeiture, pecuniary or otherwise, incurred under any Act of Congress, except those matters within the jurisdiction of the Court of International Trade."  28 U.S.C. § 1355.

### c.    Sovereign Immunity

The United States may not be sued without its consent.  *Preferred Risk Mut. Ins. Co. v. United States*, 86 F.3d 789, 792 (8th Cir. 1996).  That consent must be express and unequivocal.  *Id.*  Section 702 of the Administrative Procedure Act expressly waives sovereign immunity as to any action for nonmonetary relief brought against the United States.  *Raz v. Lee*, 343 F.3d 936, 938 (8th Cir. 2003) (the APA waives the United States' sovereign immunity as to equitable actions) (per curiam).  Return of forfeited property is an equitable remedy.  *See, e.g., Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) (defining an equitable remedy in part as an action for specific relief that may include an order for the recovery of specific property); *Marshall Leasing, Inc. v. United States*, 893 F.2d 1096, 1099 (9th Cir. 1990) (holding that a claim seeking return of property forfeited pursuant to 21 U.S.C. § 881 is cognizable under the APA); *see also Willis v. United States*, 787 F.2d 1089, 1092-93 (7th Cir.1986).

The APA's waiver applies to suits to "set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a). An "arbitrary and capricious decision exists where an 'agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Von Eye v. United States*, 92 F.3d 681, 685 (8th Cir. 1996) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983)).

There is a strong presumption favoring judicial review of administrative actions. *I.N.S. v. St. Cyr*, 533 U.S. 289, 298 (2001); *Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 670 (1986). A failure to resort to the statutory scheme for forfeiture cannot deprive the court of jurisdiction to hear a constitutional challenge. *Marshall Leasing*, 893 F.2d at 1099. Federal courts have jurisdiction to review whether administrative forfeitures satisfy statutory and due process requirements. *United States v. Woodall*, 12 F.3d 791, 793 (8th Cir. 1993) (finding jurisdiction under equitable principles), *abrogated on other grounds by Dusenbery v. United States*, 534 U.S. 161 (2002) ; *United States v. Minor*, 228 F.3d 352, 357 (4th Cir. 2000) (finding jurisdiction to consider the plaintiff's "constitutionally-derived equitable challenge to the administrative forfeiture of the currency under the provisions for general federal question jurisdiction"); *see also United States v. Clagett*, 3 F.3d 1355, 1356 (9th Cir. 1993); *Sarit v. United States Drug Enforcement Admin.*, 987 F.2d 10, 16-17 (1st Cir. 1993).

        d.     Failure to exhaust administrative remedies

Under the APA, federal judicial review of administrative decisions is available once the agency renders a final decision.  *Heckler v. Ringer*, 466 U.S. 602, 605 (1984) (stating that judicial review is available only after the Secretary renders a 'final decision' on the claim).   Generally, a plaintiff who fails to exhaust its administrative remedies will be precluded from seeking relief in federal court.  *See Weinberger v. Salfi*, 422 U.S. 749, 764 (1975).  Exhaustion is required in order to prevent premature interference with agency processes, to permit  the agency to function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review. *In Home Health, Inc. v. Shalala*, 272 F.3d 554, 559-60 (8th Cir. 2001).  The doctrine of exhaustion of administrative remedies is not a strict jurisdictional requirement, but rather a flexible concept that must be tailored to the circumstances of the particular case.  *Arkla Exploration Co. v. Texas Oil & Gas Corp.*, 734 F.2d 347, 355 (8th Cir.1984).

Section 704 of the APA provides that agency actions made reviewable by statute and final agency actions "for which there is no other adequate remedy in a court" are subject to judicial review.  5 U.S.C. § 704.  The legislative history of § 704 shows that Congress intended thereby to codify the existing law concerning ripeness and exhaustion of remedies. *Bowen v. Massachusetts*, 487 U.S. at 902.  The provision makes it clear that Congress did not intend the general grant of review in the APA to duplicate the previously established special statutory procedures relating to specific agencies.  *Id.* at 902-03 (referring to Federal Trade Commission, National Labor Relations Board, and Interstate Commerce Commission orders subject to review in either regional courts of appeals or by specially constituted courts).   Nevertheless, the duplicative-procedure exception is

restrictively interpreted.  *Id.* at 903-904, 905 n.39 (noting that the avoiding duplication exception "should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action").  The remedies available in other courts, such as the Court of Claims under the Tucker Act, do not provide the kind of "'special and adequate review procedure' that will oust a district court of its normal jurisdiction under the APA" since the Court of Claims "does not have the general equitable powers of a district court to grant prospective relief."  *Id.* at 905 n.39.

The APA defines "agency action" as including "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," 5 U.S.C. § 551(13), and "rule" is in turn defined to include "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy," 5 U.S.C. § 551(4) (emphasis added).  In order for an agency action to be deemed final at least two conditions must exist: first, the action must mark the consummation of the agency's decision making process——it must not be of a merely tentative or interlocutory nature; and second, the action must be one by which rights or obligations have been determined, or from which legal consequences flow.  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997); *cf. Nippon Miniature Bearing Corp.*, 230 F.3d at 1138 (finding the mere assessment of a penalty against an importer under section 1592 is not a final agency action because it does not determine the rights and liabilities of the parties, and no legal consequences flow from it).  "[I]f the agency has issued 'a definitive statement of its position, determining the rights and obligations of the parties,' that action is final for purposes of judicial review despite the 'possibility of further proceedings in the agency' to resolve subsidiary issues."  *Sierra Club v. United States Army Corps of Eng'rs*, 446 F.3d 808, 813 (8th Cir. 2006) (quoting *Bell v. New Jersey*, 461 U.S. 773, 779-80 (1983)).

Moreover, a party may be excused from exhausting administrative remedies if the complaint involves a legitimate constitutional claim, if irreparable harm would result from exhaustion, or if further administrative procedures would be futile.  *In Home Health*, 272 *F.3d at 560*; *Arkla Exploration Co.*, 734 F.2d at 355 (noting that as a general matter of administrative law, it is well established that where the pursuit of administrative remedies would be futile, failure to exhaust such remedies should be excused).  An administrative remedy will be deemed futile if there is doubt about whether the agency could grant effective relief.  *Id.*  If the agency's hostile attitude makes it impossible for the litigant to obtain the relief he seeks or renders it highly improbable that he will obtain such relief, exhaustion will not be required.  *Id.*; *Sioux Valley Hosp. v. Bowen*, 792 F.2d 715, 724 (8th Cir. 1986) (stating that "when an administrative appeal would be futile and little more than a formality, exhaustion will not be required.").

> e.     Agency discretion

Matters committed to agency discretion are not subject to judicial review under the APA.  See 5 U.S.C. § 701(a)(2).  The exception precluding review of actions committed to agency discretion by law in section 701(a)(2) is very narrow.  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  Section 701(a)(2) only applies in the rare instances where the statute is drawn in such broad terms "so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Id.*  However, even where the court's jurisdiction is limited by the APA, "it is well established that judicial review exists over allegations of constitutional violations even when the agency decisions underlying the allegations are discretionary."  *Webster v. Doe*, 486 U.S. 592, 603 (1988) (holding that § 701(a)(2) does not preclude constitutional claims and noting that serious constitutional questions would arise if a federal statute were construed to deny any judicial forum for a

colorable constitutional claim); *Wong v. Warden, FCI Raybrook*, 171 F.3d 148, 149 (2d Cir. 1999) (when the agency exercises its discretion in a constitutionally impermissible manner, it is subject to judicial review).

   f. Forfeiture statutes

  The procedures under federal forfeiture statutes are substantially similar.  *See e.g.*, 19 U.S.C. § 1595a; 21 U.S.C. § 881; *United States v. Little Al*, 712 F.2d 133, 136 n.2 (5th Cir. 1983).  Generally, federal forfeiture statutes provide that concerned persons who receive notice of a penalty have a reasonable opportunity to make representations, both oral and written, seeking remission or mitigation of the monetary penalty and that at the conclusion of any proceeding, the agency shall provide to the person concerned a written statement which sets forth the final determination and the findings of fact and conclusions of law on which such determination is based.  *See, e.g.*, 19 U.S.C. § 1592.

  Under the Tariff Act, "Master" is defined as "the person having control of the vessel." 19 U.S.C. § 1401(e).  In the related context of seizures for controlled substances under 21 U.S.C. § 881, which also involves a common-carrier defense provision, the burden is on the government to prove the claimant either consented to or had knowledge of the contraband operation.  21 U.S.C. § 881(a)(4)(A) ; *United States v. One (1) 1944 Steel Hull Freighter Converted Wartime Landing Craft (LLU) Shamrock*, 697 F.2d 1030, 1031 (11th Cir. 1983) (holding that if common carrier status is proved, the burden is on the government to prove the owner or operator of the conveyance "was privy to the illegal activity or a consenting party thereto").

  2. Fed. R. Civ. P. 12(b)(6)

  Under the Federal Rules, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The rules

require a "'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 n.3. (2007) (quoting Fed. R. Civ. P. 8(a)(2)). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Twombly*, 550 U.S. at 555).  In order to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the plaintiff's obligation to provide the grounds for his entitlement to relief necessitates that the complaint contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555.

The factual allegations of a complaint are assumed true and construed in favor of the plaintiff, "even if it strikes a savvy judge that actual proof of those facts is improbable and 'that a recovery is very remote and unlikely.'" *Id.* (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).  "On the assumption that all the allegations in the complaint are true (even if doubtful in fact)," the allegations in the complaint must "raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555-56.  In other words, the complaint must plead "enough facts to state a claim for relief that is plausible on its face." *Id.* at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (stating that the plausibility standard does not require a probability, but asks for more than a sheer possibility that a defendant has acted unlawfully).

Determining whether a complaint states a plausible claim for relief is "a context-specific task" that requires the court "to draw on its judicial experience and

16

common sense." *Id.* at 1950.  Accordingly, under *Twombly*, a court considering a motion to dismiss may begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  *Id.*  Although legal conclusions "can provide the framework of a complaint, they must be supported by factual allegations." *Id.*  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.  *Id.*

Thus, the court must find "enough factual matter (taken as true) to suggest" that "discovery will reveal evidence" of the elements of the claim.  *Twombly,* 550 U.S. at 558, 556; *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 347 (2005) (explaining that something beyond a faint hope that the discovery process might lead eventually to some plausible cause of action must be alleged).  When the allegations in a complaint, however true, could not raise a claim of entitlement to relief, the complaint should be dismissed for failure to set a claim under Fed. R. Civ. P. 12(b)(6).  *Twombly,* 550 U.S. at 558; *Iqbal*, 129 S. Ct. at 1950 (stating that "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'-'that the pleader is entitled to relief.'").

The Eighth Amendment to the United States Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.  The Excessive Fines Clause limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense. *United States v. Bajakajian,* 524 U.S. 321, 329 (1998).  "Forfeitures—payments in kind—-are thus 'fines' if they constitute punishment for an offense."  *Id.*  Traditional civil *in rem* forfeitures were not considered punishment against the individual for an offense

because historically the conduct of the property owner was irrelevant. *Id.* at 330-31. However, a modern statutory forfeiture is a "fine" for Eighth Amendment purposes if it constitutes punishment even in part, regardless of whether the proceeding is styled *in rem* or *in personam*. *Austin v. United States*, 509 U.S. 602, 621-622 (although labeled *in rem*, civil forfeiture of real property used "to facilitate" the commission of drug crimes is punishment).

The Fifth Amendment Due Process Clause protects persons against abusive, arbitrary, or oppressive conduct. *Gregory v. City of Rogers, Ark.*, 974 F.2d 1006, 1009 (8th Cir. 1992). The core of the concept is protection against arbitrary action. *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (noting that the Due Process Clause was intended to prevent government officials from abusing their power, or employing it as an instrument of oppression). To state a substantive due process claim, a plaintiff must allege government action that is arbitrary or capricious within the meaning of the Constitution. *Condor Corp. v. City of St. Paul*, 912 F.2d 215, 220 (8th Cir. 1990). That determination "turns on whether it is so 'egregious' and 'irrational' that the action exceeds standards of inadvertence and mere errors of law." *Id.* Cognizable claims include "the universe of executive abuses that shock the conscience and violate the decencies of a civilized society." *Moran v. Clarke*, 296 F.3d 638, 647 (8th Cir. 2002) (en banc) (involving conspiring to manufacture evidence and purposeful scapegoating).

*Analysis*

The court finds that the defendants' motion to dismiss should be denied. The court has subject matter jurisdiction to review the CBP's administrative decisions under 28 U.S.C. § 1331. Further, because this is an action for equitable relief, the United States has

18

clearly and unequivocally waived its sovereign immunity to suit in section 702 of the APA.

The court finds the administrative decisions issued by the CBP thus far are final decisions subject to judicial review under the APA.  The decisions are not tentative or interlocutory and they conclusively determine UP's rights and obligations under the CBP's interpretation of the Tariff Act.  The mitigation decisions and denials of reconsideration therefore definitively state CBP's position with respect to UP's liability under the Tariff Act. CBP has given an authoritative interpretation of a statutory provision.  The evidence that Homeland Security is pursuing enforcement actions shows that once CBP responded to UP's requests for reconsideration of the mitigation decisions, there was effectively nothing left for the agency to do.   In numerous, successive, and substantively identical responses to the challenges raised by UP, CBP clearly and publicly articulated its unequivocal position on the interpretation of the Tariff Act.  The rejection of UP's petitions to reconsider its original rulings represented CBP's final determination of the applicability of the statutory provision and its demands for the payment of penalties marked the conclusion of the agency's decision-making process.  UP has shown that legal consequences flowed from the decisions, placing UP in the position of having to risk additional penalties and further seizures of railcars under CBP's interpretation of the statute and regulations.

The Government's contention that UP's claims are barred because it has an adequate remedy in another forum is unavailing.  Waiting for the Government to pursue an enforcement action in order to assert its claim as a defense is not the sort of special and adequate review procedure that is envisioned by the APA's provision prohibiting duplicative proceedings.  The equitable and declaratory relief that UP seeks cannot be obtained in another forum.

The Government's argument that a denial of a petition for remission of forfeiture is a matter committed to agency discretion and not subject to judicial review under the APA is similarly misplaced.  It is not the exercise of the agency's discretion or the determination of the adequacy of the amount remitted that is challenged here, but rather the adequacy of the proceeding itself and the authority of the agency to take the action it has taken.  UP is not challenging the merits of CBP's mitigation and remission decisions, but the legality of the imposition of the penalty on a common carrier in its position.  This is an action for a violation of constitutional rights, over which this court has jurisdiction, regardless of exhaustion or the availability of other remedies.  In any event, the evidence presented to the court shows that further exhaustion would be futile.

The court further finds that the Counts III and IV of the plaintiff's complaint state Constitutional claims.  With respect to the excessive fines claim, UP has alleged facts that show the penalties have a punitive component.  The provision of an innocent owner/common carrier defense shows that some degree of culpability is at issue.  The penalties were assessed for failure of UP to exercise the requisite degree of due care, showing that UP's conduct is a factor.  UP's complaint also states a claim for a substantive due process violation.  It is at least plausible that the Government's imposition of a duty on UP to stop and inspect railcars that are not under UP's control is arbitrary to a point that satisfies the substantive due process standard.  The defendants' motion to suspend briefing on the plaintiff's motion for summary judgment is rendered moot by this ruling.

Accordingly,

IT IS ORDERED:

1.      The defendants' motion to dismiss (Filing No. 34) is denied.

2.      The defendants' motion to suspend briefing (Filing No. 61) is denied as moot;

3.      The defendants shall respond to the plaintiff's motion for summary judgment

(Filing No. 56) within 21 days of the date of this order.

4.      The plaintiff shall reply, if necessary, within 7 days thereafter.

DATED this 11th day of June, 2010.

                            BY THE COURT:


                            s/ Joseph F. Bataillon
                            Chief United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.