IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNION PACIFIC RAILROAD COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | 8:08CV336 |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM AND ORDER** |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | 8:10CV430 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND ORDER** |
| | ) | |
| UNION PACIFIC RAILROAD COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:10CV444 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND ORDER** |
| | ) | |
| UNION PACIFIC RAILROAD COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the court on a motion for summary judgment filed by Union

Pacific Railroad Company (hereinafter, "UP"), Filing No. 56 in 8:08CV336, and on a motion

for judgment on the administrative record filed by the United States Department of

Homeland Security (hereinafter, "the government").[1]  Filing No. 120 in 8:08CV336.  These are consolidated cases involving review of an agency action under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*[2]   *See* Filing No. 148, Consolidation Order.  UP challenges assessments of penalties by the United States Customs and Border Patrol ("CBP") under the Tariff Act of 1930, 19 U.S.C. § 1584 *et seq.*, for failing to properly manifest illegal drugs found in railcars, and raises a constitutional challenge under 42 U.S.C. § 1983.  *See* Filing No. 1, Complaint in 8:08CV336.  The government opposes UP's action and seeks forfeiture of the seized railcars and enforcement of the monetary penalties. See Filing No. 90, First Amended Answer in 8:08CV336; Filing No. 1, Complaint in 8:10CV430; Filing No. 1, Complaint in 8:10CV444.  The issue of return of the seized railcars has been settled, but the government reserves the right to enforce the Tariff Act in the same way in the event of future seizures and accordingly UP continues to challenge the CBP's authority to seize the cars and requests prospective relief on the issue.  *See* Filing No. 177, Joint Stipulation.

Thirty-eight penalty cases are at issue in this case.  Each case follows essentially the same factual scenario.  The administrative record shows that both UP and CBP took essentially the same positions and raised the same arguments in all of the thirty-eight

---

[1]Until 2002, the Customs Service existed as part of the Department of the Treasury.  *See* 68 Fed. Reg. at 68167.   The Department of Homeland Security ("DHS") was created when Congress enacted the Homeland Security Act of 2002.  *Id.* at 68167-68.  The Homeland Security Act transferred the functions, personnel, assets, and liabilities of the Customs Service, including the functions of the Secretary of the Treasury, to the newly created DHS.  *Id.* at 68168.  The Customs Service, later renamed Customs and Border Patrol (CBP), thereby became a component of DHS.  *Id.*  The Department of the Treasury also delegated certain Customs revenue functions to DHS.  *Id.*  Accordingly, the rules designed to ensure cargo safety and security and revenue assessment now fall within the jurisdiction of DHS.

[2]Also pending is a motion to stay the government's cross-motion, Filing No. 124.  UP concedes that the motion is moot.  Filing No. 130, UP's Reply Brief at 1 n.1.

penalty cases.  In each instance, CBP assessed a penalty and/or seized a railcar when it discovered illegal drugs on trains entering the United States from Mexico at Calexico, California; Brownsville, Texas; or Nogales, Arizona.  The penalties assessed total more than $37 million.

In its motion for summary judgment, UP argues that it is entitled to judgment as a matter of law under the Tariff Act.  It contends that undisputed evidence shows that UP is not an entity subject to penalties under the Tariff Act and, if it were, it is exempt from the penalties as a common carrier because it cannot know, in the exercise of the highest degree of care and diligence, that drugs are onboard trains before being inspected by CBP. It also contends that it was not grossly negligent in failing to prevent the placement of drugs onboard the railcars.  Further, it argues that the assessment of penalties and imposition of forfeitures on UP is a violation of the Fifth and Eighth Amendments to the Constitution.

The government opposes UP's motion for summary judgment and also seeks review under the Administrative Procedure Act.  In addition to again raising the arguments that the court rejected in ruling on its motion to dismiss, it argues that the court's review is limited to the administrative record and contends that UP has not demonstrated that CBP's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  It also argues that the court must defer to the CBP's interpretation of the Tariff Act.

## I.  FACTS

The factual scenario is set forth in the court's earlier order denying the government's motion to dismiss and need not be fully repeated here except as necessary to the court's opinion.  For the most part, the facts set forth in the court's earlier opinion are supported

by the administrative record in this case.  The issues in the parties' respective motions are largely coextensive and present questions of law that can be addressed on the administrative record, which has been filed with the court.[3]   See Filing No. 111, Administrative Record ("Admin. R.") Part I; Filing No. 112, Admin. R. Part II; Filing No. 113, Admin. R. Part III; Filing No. 114, Admin. R. Part IV.

As noted, each of the incidents followed essentially the same factual scenario.  In each case, a railcar entered the United States and was searched by CBP officials.  *See, e.g.*, Filing No. 111, Admin. R. Part I at 53 (Doc # 111-1, Page ID # 1697).  The CBP found drugs concealed in the railcars and assessed penalties against UP under the Tariff Act.  *Id.* at 31 (Doc # 111-1, Page ID # 1724).   UP protested the assessments and sought cancellation of the penalties or mitigation of the penalties to zero, arguing, *inter alia*, that UP was not subject to the penalties.  *Id.* at 6 (Doc # 111-1, Page ID # 1699).  In each case, the CBP agreed to mitigate the penalty to 10% of the assessed penalty, and in some cases, agreed to mitigate the penalty to 5%.  *See, e.g., id.* at 11, 13 (Doc # 111-1, Page ID # 1704, 1706).  In most cases, CBP later made demands for payment.  *See, e.g.*, Filing No. 111, Admin R. Part I, Attachment 2 at 3 (Doc # 111-2, Page ID # 1752); Filing No. 114, Admin. R. Part IV, Attachment 1 at 18 (Doc # 114-1, Page ID # 3742).

---

[3]UP presented materials in response to the government's motion to dismiss that were not part of the administrative record.  See Filing No. 60, Index of Evid.  Some of those materials have also been submitted to the court in UP's Supplemental Index.  Filing No. 135, Supplemental Index of Evid.  The evidence largely consists of correspondence between UP and CBP concerning the penalty assessments.  *Id.*, Exs. 1 & 2, omitted documents (Doc # 135-2, Page ID # 4661-62) or (Doc # 135-3, Page ID # 4663-4707).  For the most part, the correspondence addresses essentially the same issues that were raised elsewhere in administrative proceedings and the evidence is largely duplicative of other materials that can be found in the administrative record.  *See* Filing No. 131, Index of Evid., Ex.1, Affidavit of William Lamson at 2-4 (correlating CBP case numbers with corresponding UP exhibit numbers and CBP File/Bates numbers) (Doc # 313-1, Page ID # 4494-97).  Though the evidence provides some relevant background and context to the administrative proceedings, the court finds the supplementary evidence is not necessary to resolution of the issues in this case and the court did not rely on that evidence in making its decision.  To the extent that any of the supplemental evidence is cited in this opinion, it is only to provide background and context.

In the administrative proceedings, UP argued that it was not liable for penalties under 19 U.S.C. § 1584 because it was neither the owner nor the "the person in charge" of the trains bound to the United States. *See, e.g.*, Filing No. 111, Admin R. Part I, Attachment 2 at 20 (Doc # 111-2, Page ID # 1769). Further, it argued that it had exercised the highest degree of care and diligence. *Id.* It also argued that it had no ability to verify the accuracy of the manifests until after it received possession of the trains from CBP, and finally, it argued that the adverse financial impact of a series of ongoing penalty claims would reduce its ability to devote capital to projects promoting security and drug interdiction. *Id.*

As set forth in the following representative rulings, the CBP initially rejected UP's arguments on initial petitions and later affirmed the penalty assessments in response to supplementary petitions for relief.[4] *See*, *e.g.*, *id.* at 19, 31 (Doc # 111-2, Page ID ## 1768, 1780). The CBP affirmed the initial finding that "petitioner [UP] did not have any knowledge that drugs were being smuggled in the railcars," but nonetheless found that UP "failed to exercise the highest degree of care and diligence." Filing No. 111, Admin. R. Part I, Attachment 1 at 4 (Doc # 111-1, Page ID # 1697). Although it acknowledged that UP had no opportunity to inspect the railcars prior to CBP's inspection, it stated that CBP "has advised petitioner on numerous occasions that by presenting the manifest it is responsible for its accuracy" and found that "it is incumbent upon petitioner to ensure railcar inspection in Mexico prior to crossing the border—whether this is done by petitioner alone, in conjunction with Ferromex [the Mexican railroad, Ferrocarril Mexicano, S.A., de C.V. ], or by hiring a third-party contractor*." Id.* Reasoning that "[t]he pertinent question in this case

---

[4]The CBP's responses can generally be characterized as "form" responses, in that most responses contain identical language and rationales.

is not who was responsible for presenting the manifest but rather whether as the carrier UPRR exercised the highest degree of care and diligence in preventing the drug smuggling in its railcar," the CBP determined "that the security procedures that UPRR had in place at the time of the incident were insufficient to prevent the smuggling of the drugs in the center spine of the subject railcar." *Id.* at 10 (Doc # 111-1, Page ID # 1703).

The CBP's finding was based on this assessment of the facts:

> It is clear that someone in Mexico either acting alone or in group was able to obtain access to the railcar and smuggle 60.95 kilos of marijuana in the center spine of the railcar without detection by a security guard. The weight of the marijuana would have required more than one person to be able to carry and conceal the illegal drugs. The placement of the drugs in the center spine of the railcar would have required significant amount of time and would have had the potential to expose the person or persons involved to discovery.

*Id.* In another case, it noted: "under the facts in this case, wherein 117 kilograms were able to be smuggled inside a false wall in the railcar, petitioner did not exercise the highest degree of care and diligence." Filing No. 111, Admin. R. Part I, attachment 2 at 33 (Doc # 111-2, Page ID # 1783).

In response to UP's challenges to the assessments, CBP stated that it found UP's level of culpability "to be one of negligence." *Id*. at 35 (Doc #111-2, Page ID #1784). "In consideration of the level of culpability and UP's participation in the LBCIP [Land Border Carrier Initiative Program] and Customs Trade Partnership Agreement Against Terrorism," CBP generally granted extraordinary remission to 10% of the total, noting that it "expected UP to specifically address the recurring problem of drug smuggling" within voids of railcars entering the United States. *Id.* CBP explained:

> Furthermore, it is important to note that the subject drug seizure incident and several prior ones are factually similar, i.e., drugs secreted above the wheel

area, in a false compartment, within the center beam of a railcar, within a side sill or in an empty railcar. This begs the question, how many more drug seizure incidents of these types will occur until petitioner effectively addresses the problem? CBP has consistently encouraged carriers to have procedures in place that ensure knowledge of who they are doing business with—whether they are customers or business partners—and in turn, promote increased diligence in security practices by all. In today's environment, this effort is paramount not only to drug interdiction, but also to our national interest in the fight against terrorism and the smuggling of weapons of mass destruction. We note that in addition to being a signatory to the Land Border Carrier Initiative Program ("LBCIP"), petitioner is also a signatory to the Customs-Trade Partnership Against Terrorism ("C-TPAT"). Thus, petitioner has twice agreed not only to implement its own security practices, but to encourage its customers and partners to do the same.

Filing No. 111-2, Admin. R. Part II at 34 (Doc # 111-2, Page ID # 1783). CBP cited the

case of *ARCA Airlines, Ltda. v. United States Customs Service*, 726 F. Supp. 827, 828

(S.D. Fla.), *aff'd.*, 945 F.2d 413 (11th Cir. 1991) for the proposition that UP "has chosen

to engage in a high-risk market of carriage (in this instance, from Mexico to the U.S.); thus,

any costs incurred by investing in appropriate security measures are ones that petitioner

should expect." *Id.* Without citation of any authority, under the heading, "Statement of the

Law," CBP stated:

As a common carrier, petitioner is liable for the penalty under 19 U.S.C. 1584(a)(2) if there was either knowledge of the drug smuggling or a failure to exercise the highest degree of care and diligence in preventing it. In the land border environment, exercising the highest degree of care and diligence involves establishing a comprehensive security plan that addresses the high threat level for drug smuggling on railcars, along with evidence that it was successfully implemented at the time of the drug incident.

It also includes, among other things, the following: conducting employee background checks and updating them on a regular basis; providing security training to its workforce; ensuring the integrity of railcars at all times from the time of pick-up and/or loading, including the verification of container seal numbers; establishing security measures to prevent foul play during the delivery of railcars to the border; as well as reporting to CBP anomalies or suspicious behavior at anytime during the transportation process.

*Id.* at 32 (Doc # 111-2, Page ID # 1781).

Further, CBP rejected UP's contentions that the penalties adversely affected its financial ability to further cooperate with CBP by stating that "without documentary evidence including copies of income tax returns for the previous three years and an audited financial statement for the most recent fiscal quarter from UPRR, we are unable to assess UPRR's claimed financial inability to pay the penalty in this case."  *Id.* at 34 (Doc # 111-2, Page ID # 1783).

The record shows that UP and the government entered into a Land Border Carrier Initiative Program Agreement ("LBCIP Agreement") in 1998.  Filing No. 111, Admin. R. Part I, Attachment 1 at 22-25 (Docket # 111-1, Page ID # 1715-18).  The LBCIP Agreement outlined the responsibilities of both UP and the government to help minimize the smuggling of illegal drugs into the United States.  *Id.*  Under the LBCIP Agreement, CBP agreed to follow specific procedures with respect to the assessment and mitigation of penalties, including an automatic mitigation "if there is no evidence of complicity on the part of the carrier" and expedited consideration.  *Id.* at 75 (Doc # 111-1, Page ID # 1719).  CBP was required to "provide security training to the Carrier's employees on a priority basis and, <u>if feasible</u>, provide training to Carrier employees in foreign countries."  *Id.* at 73 (Doc # 111-1, Page ID # 1717) (emphasis added).

The government does not dispute that UP has undertaken a number of significant actions on the U.S. side of the border to prevent the smuggling of illegal drugs from Mexico, spending at least $3.6 million annually on drug interdiction programs.  *See*, *e.g.*, Filing No. 111, Admin. R. Part 1, Attachment 10 at 36-37 (Doc # 111-10, Page ID # 1990-91).  As part of this effort, UP maintains a commissioned police force, supplemented by

contract security officers and K9 teams, devoted in substantial measure to detecting and removing illegal drugs from trains once they cross into the United States. *See*, *e.g.*, *Id.*, Attachment 11 at 12-16 (Doc # 111-11, Page ID # 2015-19); Filing No. 112, Admin. R. Part II, Attachment 12 at 47-48 (Doc # 112-2, Page ID # 3055-56).   Among other things, the record shows that UP has (1) built an office for CBP personnel in Laredo, Texas; (2) installed lighting at the Nogales, Arizona, border crossing to aid in the inspection process; (3) conducted numerous joint exercises with CBP; (4) developed a computer profile to identify potential drug traffickers; (5) provided free K9 training to DEA and FBI task forces along the Mexican border; and (6) constructed a number of observation towers to facilitate CBP inspections. Filing No. 111, Admin. R. Part I, Attachment 11 at 12-13 (Doc # 111-1, Page ID # 2015-16).

Further, the record shows that UP and CBP entered into a "standstill" agreement in August of 2003.  Filing No. 111-1, Admin. R. Part I, Attachment 1 at 35 (Doc # 111-1, Page ID # 1728).  UP agreed to participate in "working groups to develop a strategy to address supply-chain security and drug-smuggling capabilities" at border crossings from Mexico and CBP agreed to hold all existing drug-related penalties and the future issuance of drug-related penalties in abeyance.  *Id.* at 22-25, Ex. A (Doc # 111-1, Page ID # 1715-18).

The record also shows that the penalties were assessed after CBP unilaterally terminated the standstill agreement, allegedly without notice to UP.  *Id.*, Attachment 2 at 31-32 (Doc # 111-2, Page ID # 1779-80).  In denying UP's petition for a total remission of the penalties, CBP acknowledged that it had terminated the agreement.  *Id.*  Although CBP had acknowledged positive results, it voided the agreement.  Filing No. 112, Admin. R. Part II, Attachment 12 at 32 (Doc # 112-12, Page ID # 3040).   In its responses to UP's petitions

9

for remission, CBP did not address UP's arguments regarding the interpretation of the statutes and regulations or UP's contention that it was not possible for UP to inspect the cars in Mexico.

It is not disputed that Ferromex brings the railcars into the United States under the supervision of CBP. *See, e.g.*, Filing No. 111, Admin R. Part I, Attachment 1 at 61 (Doc # 111-1, Page ID # 1705). At each port of entry the government inspects the railcars by scanning them with a "Vehicle and Cargo Inspection System" ("VACIS") machine. *Id.,* Attachment 2 at 108 (Doc # 111-2, Page ID # 1752). The inspection sometimes includes physical inspection by CBP officers to verify and compare the manifest with the actual cargo inside the railcars. *See, e.g.*, *id.* at 113 (Doc # 111-2, Page ID # 1756). There is no dispute that UP manifested that the railcars were empty in each of the cases. *See, e.g., id.,* Attachment 1 at 12 (Doc # 111-1, Page ID # 1705). For all manifests of railcars northbound to the United States from Mexico, UP, or another appropriate railroad company, prepares and makes the manifests available to U.S. Customs. Filing No. 111, Admin. R. Part 1 at 66 (Doc # 111-1, Page ID # 1710).

The record establishes that UP owns 26% of the stock of the Mexican railroad, Ferromex. Filing No. 111, Admin. R. Part I at 489 (Doc # 111-13, Page ID # 2128). CBP does not dispute UP's contention that it owns no facilities in Mexico and does not hire, supervise, or in any way direct the individuals in Ferromex's terminal and switching operations. *See, e.g.*, Filing No. 111, Admin R. Part I at 67 (Doc # 111-1, Page ID # 1711). Further, CBP concedes that UP has no opportunity to inspect the railcars prior to CBP's inspection. *Id.* at 59 (Doc # 111-1, Page ID # 1703).

## II.  LAW

### A.  APA/Statutory Construction

The Administrative Procedure Act provides that a reviewing court "shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."  5 U.S.C. § 706.  A reviewing court is instructed to "compel agency action unlawfully withheld or unreasonably delayed" and to "hold unlawful and set aside agency action, findings, and conclusions" that are found to be arbitrary, capricious, or an abuse of discretion; contrary to the Constitution; not authorized by statute, or "in excess of statutory jurisdiction; or "without observance of procedure required by law."  5 U.S.C. § 706(1) & (2) (A)-(D); *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, —, 129 S. Ct. 1800, 1810 (2009).  Federal courts can review agency action (or a final rule declining to take action) to ensure compliance with the statute Congress enacted.  *American Elec. Power Co., Inc. v. Connecticut*, — U.S. —, —,131 S. Ct. 2527, 2539 (2011).  Under the APA, the prescribed order of decision making is that "the first decider under the Act is the expert administrative agency, the second, federal judges."  *Id.*  The "judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent."  *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984).

In construing a statute, the court is required to examine the text of a statute as a whole by considering its context, object and policy.  *Mader v. United States*, 654 F.3d 794, 800 (8th Cir. 2011) (*en banc*).  The court's ultimate objective in interpreting a federal statute is to give effect to the intent of Congress.  *Id.* (quoting *United States v. Vig*, 167 F.3d 443, 447 (8th Cir. 1999)).  "It is a fundamental canon of statutory construction that the

words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989). Interpretation of a word or phrase "'depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis.'" *Kasten v. Saint-Gobain Performance Plastics Corp.*, — U.S. —, —, 131 S. Ct. 1325, 1327 (2011) (quoting *Dolan v. United States Postal Service*, 546 U.S. 481, 486 (2006)); *see also Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 222 (2008) (construction of a statutory term "must, to the extent possible, ensure that the statutory scheme is coherent and consistent").

The court begins with "'the assumption that the ordinary meaning of the language' chosen by Congress 'accurately expresses the legislative purpose.'" *Microsoft Corp. v. i4i Ltd. P'ship*, — U.S. —, —, 131 S. Ct. 2238, 2245 (2011) (quoting *Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004)); *Wall v. Kholi*, — U.S. —, —, 131 S. Ct. 1278, 1284 (2011) (stating that courts "give the words of a statute their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import"); *Bilski v. Kappos*, — U.S. —, —,130 S. Ct. 3218, 3226 (2010) (stating that unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning).  "Where Congress uses a common-law term in a statute, [the Court assumes] the 'term . . . comes with a common law meaning, absent anything pointing another way.'" *Microsoft Corp. v. i4i*, — U.S. at —, 131 S. Ct. at 2340 (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 48 (2007)).  When identical words are used in different part of the same act, the normal rule of statutory construction is that they

are intended to have the same meaning.  *Sorenson v. Secretary of the Treasury*, 475 U.S. 851, 860 (1986).

Under the canon of constitutional avoidance, courts should construe ambiguous statutory language be to avoid serious constitutional doubts.  *F.C.C. v. Fox,* 556 U.S. at —, 129 S. Ct. at 1812 n.3; *Solid Waste Agency of N. Cook Cnty. v. United States Army Corps of Eng'rs,* 531 U.S. 159, 173 (2001) (stating that where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress).

When Congress has "explicitly left a gap for an agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," and any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute.  *See Chevron,* 467 U.S. at 843-844.  Similarly, "'[s]ometimes the legislative delegation to an agency on a particular question is implicit,'" that is, Congress may not have expressly delegated authority or responsibility to implement a particular provision or fill a particular gap, but it "can still be apparent from the agency's generally conferred authority and other statutory circumstances that Congress would expect the agency to be able to speak with the force of law."  *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001).  When circumstances indicate that such an expectation exists, the court is "obliged to accept the agency's position if Congress has not previously spoken to the point at issue and the agency's interpretation is reasonable."  *Id.*

To resolve a statutory construction issue involving an agency's interpretation, the court applies the two-part framework established by the Supreme Court in *Chevron*, 467 U.S. at 842-43.  At step one, the court determines "whether Congress has directly spoken to the precise question at issue."  *Id.*  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Id.*  If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, but determines "whether the agency's answer is based on a permissible construction of the statute."  *Id.* at 843.

Administrative implementation of a particular statutory provision qualifies for deference when it appears that Congress delegated authority to the agency to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.  *Mead Corp.*, 533 U.S. at 227-28, 230 (also noting that "the overwhelming number of our cases applying *Chevron* deference have reviewed the fruits of notice-and-comment rulemaking or formal adjudication").  Agencies must comply with general procedures, known as "notice and comment" rulemaking, when formulating "rules" as defined in the APA.  *See* 5 U.S.C. §§ 551, 553; *see American Bancorporation, Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 509 F.2d 29, 33 (8th Cir. 1974).  Legislative rules "affect[ ] individual rights and obligations."  *Morton v. Ruiz*, 415 U.S. 199, 232 (1974).  A rule is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency. . . ."  5 U.S.C. § 551(4).

14

If a challenged agency action creates a "legislative rule," then full compliance with the APA's notice and comment processes is required.  *See American Bancorporation*, 509 F.2d at 33.  On the other hand, "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice" can be implemented without notice and comment. 5 U.S.C. § 553(b)(A); *American Bancorporation*, 509 F.2d at 33.  An interpretive rule, as distinguished from a substantive or legislative rule, clarifies or explains existing law or regulations. *McKenzie v. Bowen*, 787 F.2d 1216, 1222 (8th Cir. 1986).  An amendment is interpretive if it merely narrows the scope of a rule or "makes explicit what was implicit under the regulation." *American Bancorporation*, 509 F.2d at 34.  In the Eighth Circuit, courts consider four criteria to determine if a rule is interpretative or legislative:  "(1) the complexity and pervasiveness of the rules issued, (2) the drastic changes effected in existing law by the rules, (3) the degree of retroactivity and its impact, and (4) the confusion and controversy engendered by practical difficulties of compliance with the new rules." *Id. at* 33.

Unless there is a statute or regulation to the contrary, courts will defer to an agency's interpretation of its regulations, unless the interpretation is plainly erroneous or inconsistent with the regulation or there is any other reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question. *Talk Am., Inc. v. Michigan Bell Tel. Co.*, — U.S. —, —, 131 S. Ct. 2254, 2260 (2011); *Chase Bank USA, N.A. v. McCoy*, 562 U.S. —, —, 131 S. Ct. 871, 880 (2011); *Auer v. Robbins*, 519 U.S. 452, 461 (1997).  An agency may not decline to regulate "if refusal to act would be 'arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law.'" *American Elec. Power,* — U.S. at —, 131 S. Ct. at 2539 (quoting 42 U.S.C. § 7607(d)(9)(A)).

Under the APA, an agency must "'examine the relevant data and articulate a satisfactory explanation for its action.'" *F.C.C. v. Fox,* 556 U.S. at —, 129 S. Ct. at 1810 (quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)). "The agency must explain the evidence which is available, and must offer a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 52 (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962)). *Judulang v. Holder,* — U.S. — —, 2011 WL 6141311, *3 (Dec. 12, 2011). The requirement that an agency provide reasoned explanation for its action ordinarily demands that, if effecting a policy change, it display awareness that it is changing position. *F.C.C. v. Fox,* 556 U.S. at —, 129 S. Ct. at 1810. The "agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books," and "of course the agency must show that there are good reasons for the new policy." *Id.* at 1810-11. The agency need not always provide a more detailed justification "than what would suffice for a new policy created on a blank slate," although, when its new policy "rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account," it must provide such justification. *Id.* In those cases, "it would be arbitrary or capricious to ignore such matters" because "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.*

16

Further, an agency must cogently explain why it has exercised its discretion in a given manner. *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 48. An agency's action must be upheld, if at all, on the basis articulated by the agency itself. *Id.* at 50 ("The agency must explain the evidence which is available, and must offer a "rational connection between the facts found and the choice made."). The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position. *Mead Corp.*, 533 U.S. at 228.

### B.  The Tariff Act

The Tariff Act provides penalties "for falsity or lack of a manifest." 19 U.S.C. § 1584. Under the penalty component of the statute, the Tariff Act provides penalties for failure to manifest merchandise and further sets out the amounts of monetary penalties for certain unmanifested illegal drugs. 19 U.S.C. § 1584 (a)(1)&(2). Customs regulations provide that if merchandise is found on a vessel or vehicle arriving in the United States that is not listed on a manifest "the master, person in charge, or owner of the vessel or vehicle or any person directly or indirectly responsible for the discrepancy is subject to such penalties as are prescribed in [19 U.S.C. 1584]." 19 C.F.R. § 123.9. The potential penalty for parties "directly or indirectly responsible for any discrepancy between the merchandise and [the] manifest of the arriving train" is limited to $10,000 per incident. 19 U.S.C. § 1584(a)(1). The potential penalty for failure to manifest merchandise consisting of heroin, morphine, cocaine, isonipecaine, or opiate, opium, or marijuana that can be imposed on "the master of such vessel or person in charge of such vehicle or the owner of such vessel or vehicle

or any person directly or indirectly responsible for" the illegal drugs "being in such

merchandise" can be much greater, depending on the weight of the contraband. 19 U.S.C.

§ 1584(a)(2).

The seizure component of the Tariff Act provides that whenever any vessel, vehicle,

or aircraft or "the owner or operator, or the master, pilot, conductor, driver, or other person

in charge of a vessel, vehicle, or aircraft" is subject to a penalty for violation of the customs

laws, "the conveyance involved shall be held for the payment of such penalty and may be

seized and forfeited. . . ." 19 U.S.C. § 1594(a)(1) and (2). The seizure component of the

Tariff Act is cross-referenced in the penalty component of the Tariff Act as follows:

> Such penalties shall, notwithstanding the proviso in section 1594 of this title
> (relating to the immunity of vessels or vehicles used as common carriers),
> constitute a lien upon such vessel which may be enforced by a libel in rem;
> except that the master or owner of a vessel used by any person as a
> common carrier in the transaction of business as such common carrier shall
> not be liable to such penalties and the vessel shall not be held subject to the
> lien, if it appears to the satisfaction of the court that neither the master nor
> any of the officers (including licensed and unlicensed officers and petty
> officers) nor the owner of the vessel knew, and could not, by the exercise of
> the highest degree of care and diligence, have known, that such narcotic
> drugs were on board.

19 U.S.C. § 1584(a) (2) (emphasis added).

The proviso referred to above, known as the "safe harbor provision for common

carriers," states that "if prohibited merchandise is found onboard a conveyance used as

a common carrier" in unmanifested or improperly manifested packages or containers "or

concealed on the conveyance but not in the cargo," the conveyance may be seized, and

after investigation, forfeited "unless it is established that neither the owner or operator,

master, pilot, nor any other employee responsible for maintaining and insuring the

accuracy of the cargo manifest knew, or by the exercise of the highest degree of care and

18

diligence could have known, that such merchandise was on board." 19 U.S.C. § 1594(b) & (c)(1) & (2).

The Tariff Act was first enacted in 1922 to enable the government "to collect duties on all dutiable items coming into this country." *United States v. 87 5/6 Cases Beer (King),* 233 F. Supp. 555, 557 (D. Ala. 1964); *see Matoil Service & Transport Co. v. United States,* 72 F.2d 772, 773 (3d Cir. 1934) ("This is a tariff measure, and its provisions were designed to prevent the importation of merchandise into the United States without the payment of the required duty thereon").   The narcotics penalties found in § 1584(a)(2) were first enacted as part of the Narcotic Drugs Import and Export Act ("NDIEA"), and later incorporated into the Tariff Act.   *See* Pub. L. No. 67-318, § 642, 42 Stat. 858, 982-89 (Sept. 21, 1922) (imposing civil fines, enforceable *in rem*, only on the master of a vessel for drugs found on board and also providing criminal penalties for the importation of narcotics, but exempting a person in charge of a vessel, train or other vehicle if he had no knowledge of, and used due diligence to prevent, the presence of the narcotics); H. R. Rep. No. 67-1223, at 159 (1922) (Conf. Rep); 71 Cong. Ch. 497, 46 Stat. 590 (June 17, 1930) (extending liability for civil fines to persons in charge of vehicles, but continuing to limit *in rem* liability to vessels).   Prior to 1930, a fine on unmanifested illegal drugs "found on a vessel that was a common carrier was not to be imposed unless the master or owner was 'a consenting party or privy' to the smuggling."   *Lancashire Shipping Co. v. United States,* 17 F. Supp. 573, 574 (D.N.Y. 1936).   Responding to "experience under the earlier law [that] evidently showed that opium in excessive amounts was being smuggled into the country from abroad," Congress promulgated amendments to the Tariff Act in 1930 that "stiffened" the statute to provide that "liability to fine was made absolute," except fines were

not imposed on common carriers "if it were made to appear to the satisfaction of the court that the presence of the opium was not known by owner, master, or any officer and could not have been known by use of 'the highest degree of care and diligence.'" *Id.*

The Tariff Act was amended in 1986 in the Anti-Drug Abuse Act. *See* P.L. 99-570, § 3121, 1986 HR 5484, 100 Stat. 3207 (Oct. 27 1986). At that time, the monetary penalties that could be imposed on "owners, masters, or persons in charge of conveyances engaged as common carriers" for unmanifested drugs were greatly increased and the Tariff Act's sanctions were extended to common-carrier conveyances and operators when an "owner or operator, or the master, pilot, conductor, driver or other person in charge participated in, or had knowledge of, the violation, or was grossly negligent in preventing or discovering the violation," unless, with respect to prohibited merchandise concealed on the conveyance, but not in the cargo, "it [was] established that neither the owner or operator, master, pilot, nor any other employee responsible for maintaining and insuring the accuracy of the cargo manifest knew, or by the exercise of the highest degree of care and diligence could have known, that such merchandise was on board." P.L. 99-570, § 3121, 1986 HR 5484, 100 Stat. 3207 (Oct. 27 1986); s*ee also* 62 Fed. Reg. 67765-01 (describing the changes to the Tariff Act occasioned by the 1986 Anti-Drug Abuse Act amendments). Additional limiting language was added to the statute in the Anti-Drug Abuse Act of 1988, providing that "no vessel, vehicle, or aircraft is subject to forfeiture to the extent of an interest of an owner for a drug-related offense established by that owner to have been committed or omitted without the knowledge, consent, or willful blindness of

the owner." *See* Pub. L. 100-690, § 6076(b), 1988 H.R. 5210, 102 Stat. 4181 (Nov. 18, 1988), *codified at* 19 U.S.C. § 1594 (c)(2).[5]

The term "owner or operator" is defined in the seizure provision of the statute to include:  (A) a lessee or person operating a conveyance under a rental agreement or charter party; and (B) the officers and directors of a corporation; (C) station managers and similar supervisory ground personnel employed by airlines; (D) one or more partners of a partnership; (E) representatives of the owner or operator in charge of the passenger or cargo operations at a particular location; and (F) and other persons with similar

---

[5]This language closely follows the language of innocent owner exceptions promulgated under other civil forfeiture statutes.  *See, e.g.*, 21 U.S.C. § 881(a)(4) (1993); 18 U.S.C. § 983(d); *see United States v. James Daniel Good Real Property*, 510 U.S. 43, 55 (1993) ("Although Congress designed the drug forfeiture statute to be a powerful instrument in enforcement of the drug laws, it did not intend to deprive innocent owners of their property.").  In the closely-related context of forfeitures of property used to facilitate felony drug-trafficking offenses, Congress passed the Civil Asset Forfeiture Reform Act in April of 2000 ("CAFRA") "to make federal civil forfeiture procedures fair to property owners and to give owners innocent of any wrongdoing the means to recover their property and make themselves whole after wrongful government seizures." *United States v. One Lincoln Navigator*, 328 F.3d 1011, 1012 (8th Cir. 2003) (internal quotation omitted); *United States v. 777 Greene Ave.*, 609 F.3d 94, 97 (2d Cir. 2010) ("In passing CAFRA, Congress was reacting to public outcry over the government's too-zealous pursuit of civil and criminal forfeiture) (internal quotation omitted); Pub. L. No. 106-185, 114 Stat. 202 (codified at 18 U.S.C. § 983 and in scattered sections elsewhere*); see also* H.R. Rep. No. 106-192, 1999 WL 406892, at *6-7 (1999). CAFRA raises the government's initial burden of proof by requiring it "to establish, by a preponderance of the evidence, that the property is subject to forfeiture," and also sets out a strengthened innocent-owner defense. 18 U.S.C. § 983(c)(1); 18 U.S.C. § 983(d)(2)(A).  The statute defines an innocent owner as one who: "did not know of the conduct giving rise to forfeiture;" or who "upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property." *Id.* § 983(d)(2)(A)(i) &(ii).  Importantly, "[a] person is not required . . . to take steps that the person reasonably believes would be likely to subject any person (other than the person whose conduct gave rise to the forfeiture) to physical danger." *Id.* § 983(d)(2)(B)(ii).  Under CAFRA, the term "owner" expressly excludes "a nominee who exercises no dominion or control over the property." 18 U.S.C. § 983 (d)(6)(B)(iii).

However, in what has become known as the "customs carve-out," the Tariff Act of 1930 "or any other provision of law codified in title 19" is excluded from CAFRA's provisions. 18 U.S.C. § 983(i)(2)(A); *United States v. Davis*, 648 F.3d 84, 93 (2d Cir. 2011). Later, however, in the Patriot Act, Congress communicated concern for rights of innocent owners in the context of seizure of assets for terroristic activity. *See* Pub. L. 107-56, § 316 (a)-(c), 2001 HR 3162, 115 Stat. 272, 309-10 (Oct. 26, 2001). Congress clarified that the "customs carve-out," that is "[t]he exclusion of certain provisions of Federal law from the definition of the term "civil forfeiture statute" in section 983(i) of title 18, United States Code, was not to be construed "to deny an owner of property the right to contest the confiscation of assets of suspected international terrorists under" either the claims-filing provisions of 18 U.S.C. § 983, the Constitution, or the APA. *See id.*; "Anti-Terrorist Forfeiture Protection," n. following 18 U.S.C.A. § 983 (2011).

21

responsibilities.  19 U.S.C. § 1594(d)(1).  "The term 'master' and similar terms relating to the person in charge of a conveyance includes the purser or other person on the conveyance who is responsible for maintaining records relating to the cargo transported in the conveyance."  19 U.S.C. § 1594(d)(2).  Also, certain terms are expressly defined in other sections of the Tariff Act.  The word "vessel" includes every description of water craft or other contrivance used, or capable of being used, as a means of transportation in water, but does not include aircraft.  19 U.S.C. § 1401(a).  The word "vehicle" includes every description of carriage or other contrivance used, or capable of being used, as a means of transportation on land, but does not include aircraft.  19 U.S.C. § 1401(b).  The word "person" includes partnerships, associations, and corporations.  19 U.S.C. § 1401(d).  The word "master" means the person having the command of the vessel.  19 U.S.C. § 1401(e).

The term "highest degree of care and diligence" is not defined in the statute, but has an established meaning in the context of common carriers vis-a-vis passengers. *See, e.g., Frederick v. City of Detroit,* 121 N.W.2d 918, 920-21 (Mich. 1963).  The standard of care imposed upon common carriers of passengers is the common-law standard of due care, which is simply the duty to exercise such diligence as would be exercised in the circumstances by a reasonably prudent carrier. *Id.*  The high degree of care required of common carriers is the same degree of care a reasonable common carrier would use under similar circumstances. *Mosby v. Greyhound Lines, Inc.,* — F. Supp. 2d —, — , 2007 WL 4572049, *7 (E.D. Mich 2007) (unreported opinion).  The term "highest degree of care and diligence" does "not mean all the care and diligence the human mind can conceive of, nor such as will render the transportation free from any possible peril, nor such as would drive the carrier from his business." *Indianapolis & St. Louis R.R. Co. v. Horst,* 93 U.S.

291, 297 (1896). On the contrary, a common carrier must only use the degree of skill a reasonable common carrier would use under similar circumstances. *Id.*; *see also Gulley v. American Airlines*, 176 F.3d 483, 1999 WL 273156, *2 (9th Cir. 1999) (unpublished opinion) (stating that "[t]he care required of a common carrier is the highest that reasonably can be exercised consistent with the mode of transportation used and the practical operation of its business as a carrier" and the requirement is to be "measured in the light of the best precautions" that were in "common, practical use in the same business and had been proved to be effective").

There are few cases interpreting the meaning of "highest degree of care and diligence" in the context of the Tariff Act. *See, e.g.*, *Lancashire Shipping*, 17 F. Supp. at 574; of *ARCA Airlines, Ltda.*, 726 F. Supp. at 828. The standard was not met in circumstances involving failure to heed a warning by a customs inspector that opium could be smuggled in an opening on a hollow mast. *Lancashire Shipping*, 17 F. Supp. at 574. In that case, the court stated that in order to "escape a fine," an owner "must prove he left no stone unturned to prevent the carrying of opium." *Id.* at 574. The court's holding was heavily reliant on the fact that "a customs officer had already called attention to the likelihood that the hole in the mast might be used as a hiding place." *Id.* Notably, there was no question that the officers were in control of the ship at all times. *Id.* Similarly, a penalty under the Tariff Act was upheld where an airline, despite being warned of vulnerability, failed to take any security measures to prevent smuggling at its operations in Colombia. *ARCA Airlines, Ltda.*, 726 F. Supp. at 831 (holding that the standard required the carrier to "take affirmative measures to discover narcotics on board"). Again, there was no question the airline was in control of the aircraft. *Id.*

In the Anti-Drug Abuse Act of 1988, Congress specifically instructed the Secretary of the Treasury to promulgate regulations to effectuate the application of the Tariff Act to common carriers. *See, e.g.*, P.L. 100-690, 1988 H.R. 5210, § 7369. Specifically, Congress directed the Secretary to "prescribe regulations which set forth criteria for use by the owner, master, pilot, operator, or officer of, or other employee in charge of, any common carrier in meeting the standards under [19 U.S.C. 1584(a)(2) and 1594(c)] for the exercise of the highest degree of care and diligence to know whether controlled substances imported into the United States are on board the common carrier," and ordered it to do so within "120 days of the enactment and after an opportunity for public comment." P.L. 100-690, 1988 H.R. 5210, § 7369, 102 Stat. 4481 (Nov. 18, 1988). The Treasury Department's Customs Service ("Customs") later proposed such regulations. *See* Proposed Customs Regulations Amendments Relating to the Liability of Common Carriers for Failure to Exercise the Highest Degree of Care and Diligence to Prevent Unmanifested Narcotics and Marijuana, 54 Fed. Reg. 4835-01, 1989 WL 272573 (Jan. 31, 1989) (to be codified at 19 C.F.R. pt. 162). Customs proposed adding the following language to 19 C.F.R. § 162.65:

> The burden of proving that it has exercised the highest degree of care and diligence is on the common carrier. The determination as to whether or not a common carrier has carried this burden of proof will be made by Customs on a case-by-case basis. It will reflect the individual facts and circumstances, and will take into account measures taken at the foreign lading location, on board the conveyance while en route, and upon arrival in the United States.

*Id.* at 4836.  Customs also published eleven proposed procedures that a common carrier

minimally would have to follow to meet the highest degree of care and diligence standard.[6]

*Id.*

---

[6]The proposal would have required the carrier, "[d]epending on the particular facts and circumstances surrounding a carrier's failure to manifest narcotic drugs or marijuana," to "submit evidence that it performed security measures such as, but not limited to," the following:

(1) Investigating background of each employee to determine whether the employee has engaged in criminal activities, activities related to narcotics smuggling, or has a standard of living which is inconsistent with the salary being paid by the carrier.

(2) Knowing identities of representatives of companies delivering merchandise to the foreign port of lading for shipment, and identities of company employees receiving cargo at the foreign port of lading. Special attention should be paid to first-time and infrequent shippers.

(3) Maintenance of a secure facility, including locking of doors and windows and maintenance of a secure perimeter.

(4) Restricting access to the cargo area to authorized personnel only, by use of such measures as uniforms, badges, or a card key system.

(5) Maintenance of 24-hour security by use of guard details and/or an alarm system to alert officials in the event the perimeter is violated when the facility is closed.

(6) Maintenance of adequate lighting in work areas and storage facilities.

(7) Maintenance of inventory control including serially numbered bills of lading and control of seals.

(8) Routine inspection of the facility or conveyance by management and security personnel, and the taking of appropriate action on the basis of observed deficiencies.

(9) Operation of a program to insure that narcotic drugs and marijuana are not concealed in the conveyance, e.g., sealing or securing compartments within a conveyance, such as rope lockers, chain lockers, or compartments within the lavatory, where this will not affect safety or operation of the conveyance.

(10) Prompt disclosure to Customs and other law enforcement officials of information which would lead directly or indirectly to the detection of narcotics.

(11) Operation of a program designed to insure that all packages and containers are manifested and that the marks, numbers, weights and quantities on the packages and containers agree with the manifest.

*Id.*

After the first notice and comment period, Customs modified its proposal and published new proposed regulations. *See* Proposed Customs Regulations Amendments Relating to the Liability of Common Carriers for Failure to Exercise the Highest Degree of Care and Diligence to Prevent Unmanifested Controlled Substances, 56 Fed. Reg. 5665-03, 1991 WL 308953 (Feb. 12, 1991) (to be codified at 19 C.F.R. pt. 162). Customs noted that it had received comments from sea carriers, air carriers and the trucking industry, but not from rail carriers. *Id.* "Among the general comments received were that the eleven procedures set forth in the proposal are too burdensome or impossible to follow; the burden of proving the highest degree of care and diligence should not be on the carrier; the case-by-case standard of whether a carrier has sustained the burden of proof is too subjective; the type of carrier should be taken into account in determining procedures; the terms of the proposed procedures are too vague; and Customs should meet with industry representatives to work out appropriate regulations." *Id.* In the modified proposal in response to those comments, Customs continued to require that the "determination of whether the highest degree of care and diligence has been exercised" be made "on a case-by-case basis inasmuch as the circumstances of each case vary," noting that "the courts have viewed the statutory standard as requiring that those responsible for the common carrier 'leave no stone unturned' in order to avoid the liability for the statutory penalties." *Id.*, 56 Fed. Reg. at 5666. It clarified that "there is no requirement that any specific acts or steps be taken" and that "each common carrier must determine for itself what actions are appropriate for its activities." *Id.* It proposed separate criteria for sea, air and land (rail and truck) carriers. *Id.* at 5668. Addressing vagueness concerns, Customs stated:

The case-by-case application of the standard in determining whether a carrier has sustained the burden of proof is necessary inasmuch as penalties and forfeitures are incurred because of separate violations of the Customs laws. Because the circumstances of each case may differ, this permits a degree of flexibility which may well accrue to the benefit of diligent carriers. For example, two carriers may have in place identical security measures; however, because of differences in the actual facts and circumstances such as the location of the controlled substances on the carrier or implementation of the security measures in relation to a particular arrival of the common carrier, one may be found to have exercised the highest degree of care and diligence, and the other not.

*Id.*, 56 Fed. Reg. 5665-03, 5667, 1991 WL 308953.

After the additional comment period, the proposed criteria were to have been codified at 19 C.F.R. § 162.68. *Id.*, 56 Fed. Reg. at 5668. Notably, the regulation was never adopted.[7] There is no section 162.68 in the Code of Federal Regulations. Customs has never established the criteria for owners, operators, officers or employees in charge of common carriers to use to meet the standard of exercising the "highest degree of care and diligence."

Customs regulations for railroads require "[t]he conductor of a railroad train arriving from Canada or Mexico shall present to the Customs officer at the port of arrival individual car manifests and a train sheet, sometimes called a consist, bridge sheet, or trip sheet, listing each car and showing the car numbers and initials." 19 C.F.R. § 123.6. CBP implemented an advance information requirement that requires information to be transmitted electronically two hours in advance of the train as part of the Trade Act of 2002, enacted in response to the events of September 11, 2001. 19 C.F.R. § 123.91; *see*

---

[7]Customs later entered into the Land Border Carrier Initiative, "developed under Customs remission and mitigation of penalties authority pursuant to [19 U.S.C. § 1618]." Land Border Carrier Initiative Program, 62 Fed. Reg. 67765-01, 67765, 1997 WL 791313 (Dec. 30, 1997) (to be codified at 19 C.F.R. pts. 123 & 124).

27

68 Fed. Reg. 68140-01, 68140, 2003 WL 22867493 (noting that "the information required must consist of that information about the cargo which is determined to be reasonably necessary to enable CBP to identify high-risk shipments so as to ensure cargo safety and security and prevent smuggling pursuant to the laws that are enforced and administered by CBP"*)*; Pub. L. No. 107-210, § 343. 116 Stat. 933, 891 (2002) (codified at 19 U.S.C. § 2071 n. foll.).  "Specifically, to effect the advance electronic transmission of the required rail cargo information to CBP, the rail carrier must use a CBP-approved electronic data interchange system."  19 C.F.R. 123.91(a).  That regulation also sets out the responsibility of an incoming rail carrier.  19 C.F.R. 123.91(c).  With respect to the accuracy of information, the regulation states that "CBP will take into consideration how, in accordance with ordinary commercial practices, the rail carrier acquired such information, and whether and how the carrier is able to verify this information.  Where the rail carrier is not reasonably able to verify such information, CBP will permit the carrier to electronically present the information on the basis of what the carrier reasonably believes to be true."  19 C.F.R. 123.91(c)(2) (emphasis added).

### C.  The Constitution

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., amend. VIII.  Traditionally, *in rem* forfeitures, proceeding under "the fiction that the action was directed against 'guilty property,' rather than against the offender himself," were not considered punishment against the individual for an offense. *United States v. Bajakajian*, 524 U.S. 321, 330-31 (1998).  However, a modern statutory forfeiture is a "fine" for Eighth Amendment purposes if it constitutes punishment even in part, regardless of whether the

proceeding is styled *in rem* or *in personam*. *Id.* at 331 n.6; *Austin v. United States*, 509 U.S. 602, 621-22 (1993) (although labeled *in rem*, civil forfeiture of real property used "to facilitate" the commission of drug crimes is punitive in part and thus subject to review under the Excessive Fines Clause). In the criminal context, a fine is unconstitutionally excessive if the amount is grossly disproportional to the gravity of the offense. *See Bajakajian*, 524 U.S. at 334-35 (involving an offense that was ""was solely a reporting offense," and the failure to report was not related to any other illegal activity). Relevant factors in the excessive-fines analysis include legislative intent in establishing fines, and the difference between the penalty and the actual damages caused by the offense. *Id.* at 336-37; *see also State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003).

A forfeiture statute may give rise to serious constitutional questions if "property subjected to forfeiture had been taken from [an owner] without his privity or consent," or if an owner proved "not only that he was uninvolved in and unaware of the wrongful activity, but also that he had done all that reasonably could be expected to prevent the proscribed use of his property," in which case it "would be difficult to conclude that forfeiture served legitimate purposes and was not unduly oppressive." *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 689 (1974). Because most federal statutes mandating forfeiture of earnings from various illegal transactions include protections for innocent owners, "cases arising out of the seizure of proceeds do not address the question whether the Constitution would provide a defense to an innocent owner in certain circumstances if the statute had not done so." *Bennis*, 516 U.S. 442, 460 (1996) (Stevens, J., dissenting). The prevalence of protection for innocent owners in such legislation lends support to the conclusion that elementary notions of fairness require some attention to the impact of a

seizure on the rights of innocent parties.  *Id.* at 460 & n.1 (discussing strict liability in the context of proceeds of illegal acts).

The Takings Clause of the Fifth Amendment "bars the State from taking private property without paying for it, no matter which branch is the instrument of the taking."  *Stop the Beach Renourishment, Inc. v. Florida Dept. of Envntl. Prot.,* — U.S. —, —, 130 S. Ct. 2592, 2602 (2010).  Generally, when property has been seized pursuant to the criminal laws or subjected to *in rem* forfeiture proceedings, such deprivation is not a "taking" for which the owner is entitled to compensation.  *Bennis,* 516 U.S. at 452-53.  Further, as a general matter, the Supreme Court "'has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decision making in this unchartered area are scarce and open-ended.'"  *Albright v. Oliver,* 510 U.S. 266, 271-72 (1994) (plurality opinion).  The Supreme Court "has held for many years (logically or not) that the 'liberties' protected by Substantive Due Process do not include economic liberties."  *Stop the Beach Renourishment, Inc.,* 130 S. Ct. at 2606.

## III.  DISCUSSION

### A.  Unauthorized Agency Action

The court first finds that its review should be limited to the administrative record.  Based on its review of that record, the court finds the CBP's assessments of penalties on UP for failure to manifest illegal drugs penalty assessments should be set aside.  First, the court finds the imposition of monetary penalties on UP, and the concomitant seizure of railcars, are actions that are outside the authority the delegated by Congress to the agency.  The court finds the CBP's purported interpretation of the Tariff Act provisions does not comply with Congressional directives and has resulted in rulemaking without

observance of the procedures required by law.  Accordingly, this court owes no deference to the agency's interpretation of the Tariff Act.

Congress specifically directed the Agency to promulgate regulations defining and/or clarifying the meaning of the term "highest degree of care and diligence" through the notice-and-comment rulemaking process.  Because the definition was to have been promulgated by Congressional directive, the resulting definition would have been regarded as a legislative rule and not a mere agency policy, explanation or interpretation.

Congress's explicit and specific directive to the agency to promulgate regulations informing the carriers what was expected of them in order to satisfy the standard was an implicit rejection of the "leave no stone unturned" standard that had been adopted by several courts at the time.  The agency failed to follow the directive and failed to promulgate regulations that set criteria to enable common carriers to meet the "highest degree of care and diligence" standard.  It advanced and implemented a standard—"leave no stone unturned"—that had never been adopted through notice-and-comment rulemaking, and, in fact, had been rejected in the notice-and-comment process.  The agency is not free to unilaterally create its own interpretation of the Tariff Act outside the notice-and-comment procedure, nor is it free to enforce an unauthorized standard against the Railroad.

Through its actions against UP, CBP effected a final, binding, and substantive change to its past practices with regard to penalties and seizures under the Tariff Act.  In adopting and enforcing the "no stone unturned" criteria as the definition of "highest degree of care and diligence," CPB changed its prior position, and unilaterally and arbitrarily rejected an agreement with the Railroad.  Further, it did so without articulating its reasons

for the change in policy.   In pursuing that course of conduct, the CBP effectively announced a legislative rule without complying with the required notice-and-comment procedures.

CBP failed to properly promulgate regulations that would permit it to enforce its interpretation of the "highest degree of care and diligence" standard against the Railroad. Under the principles of statutory construction, without a properly-promulgated agency interpretation of the standard, the common-law meaning of the term, that is, the degree of care a reasonable common carrier would exercise under the circumstances, would be applicable.   The record shows, and the agency acknowledges, that UP has undertaken numerous measures to discover, combat, and prevent drug smuggling.   CBP has not presented evidence, or even argument, with respect to industry standards or commercial practices with respect to drug interdiction by common carriers, stating only that UP has not done enough.   Under the circumstances, CBP's actions were outside the authority granted to the agency by Congress and must be set aside.

## B.  Arbitrary and Capricious Agency Actions

The court's finding that CBP's actions were *ultra vires* disposes of the issues presented in this case.   For the sake of the record, however, the court notes that even if the CBP's actions were somehow authorized, the court would find that CBP's interpretation and application of the Tariff Act are arbitrary and unreasonable.   In keeping with the canon of statutory construction that requires the court to construe the statute as a whole and to give effect to Congress's intentions, the court would find that CBP's interpretation of the statute does not fulfill the statute's purpose nor promote the objectives of Congress.

The Tariff Act, including the amendments promulgated under the Anti-Drug Abuse Acts of 1986 and 1988, evinces a Congressional intent to exempt what can be characterized as "innocent" parties from its harsh sanctions.  The structure of Sections 1584 and 1594 indicates that the penalty and seizure components of the statute were designed to be read together and to complement each other.  Both provisions reflect Congressional concern with the culpability and blameworthiness of those on whom its sanctions are imposed.  The use of terms with established common law meanings such as "knowing," "knowledge," "gross negligence" and "willful blindness" shows that Congress did not intend the statute to operate as a *de facto* strict liability statute.  Read in context, the statute triggers penalties, and subsequently, forfeitures, only on a showing of some greater degree of culpability than ordinary negligence.  CBP acknowledges that UP's level of culpability was mere negligence.

The overall structure of the Tariff Act and other Customs and Homeland Security statutes and regulations shows Congressional concern with balancing the need to prevent smuggling against the rights of owners, masters and common carriers who are neither complicit in smuggling nor culpable with respect to drug importation.  Interpretation of "highest degree of care and diligence" as leaving "no stone unturned," and applying that interpretation to the circumstances involved in these cases effectively imposes a strict liability standard on a common carrier.  Legislative history shows that the safe harbor exemption was designed to avoid exactly that result.  Further, a strict liability standard would trigger constitutional concerns.

Use of terms that have an established, commonly-understood meaning under either common law or maritime law and that equate "person in charge" with "master," "captain,"

"purser," "driver," or "pilot" of a "vessel" indicates that Congress did not envision that an entity lacking any control over the subject conveyance would be subject to penalties.  The descriptive terms set out in the statute, read in context, imply some level of control.  It is in exercising that control that an entity could adhere to a standard of care such as "gross negligence," "the highest degree of care," or "willful blindness."

Throughout the administrative proceedings, the CBP never addressed UP's argument that it had no control over the railcars in Mexico, had no controlling interest in the Mexican railroad, and could not exercise any degree of care and diligence until the point at which the railcars were under its control.  The court finds the CBP's suggestions that UP either force Ferromex to take action or hire a private security force are not supported by statutes, regulations or caselaw, and would also be beyond the purview of CBP's authority. Those proposed solutions are not only arbitrary, but capricious, in that they are essentially impossible for UP to accomplish.

Further, even if the statute could be construed to reach a rail carrier in UP's position, the court would find the statute's safe harbor provision for common carriers would shield UP from liability.  Legislative history shows that when the reach of the Tariff Act's penalty and seizure provisions was expanded to include "brokers and agents," the safe harbor provision was also strengthened in order to protect those commonly characterized as "innocent" or nonculpable parties.  Consideration of the statute as a whole reflects Congressional concern that such innocent parties have recourse against unlawful seizures and the statute contemplates judicial involvement in the process.  The CBP's acknowledgment that UP's level of culpability was mere negligence means the Railroad would not be exposed to liability under the statute.  Because CBP conceded that UP's level

of culpability was mere negligence, there is no rational basis for the imposition of penalties that are triggered, under the statute, by conduct that would amount to at least gross negligence or willful blindness, and would include actual knowledge, participation, and complicity in illegal acts.

CBP has not challenged UP's contention that as a minority stockholder, UP does not control Ferromex and could not force it to take action. There is no authority for the proposition that a corporate or commercial entity can be compelled to ensure security in a foreign country, especially where it has no operations or employees. Also, there is no support to any assumption that a private security force could accomplish what the Mexican government cannot.

The CBP also failed to consider the Tariff Act in conjunction with the provisions of the Trade Act of 2002 that require the electronic transmission of information on incoming trains. Under the Trade Act's provisions, UP was entitled to submit information from third parties on the basis of what it reasonably believed to be true. There is no mention of that standard in the administrative record and the failure of the CBP to consider the Trade Act provision was not reasonable.

Also, CBP failed to articulate why it exercised discretion the way it did or to offer a rational connection between the facts presented and the choice to impose penalties. CBP's responses to UP's requests for an abatement of the penalties to zero can generally be characterized as form letters, containing repetitious and conclusory findings. Moreover, CBP offered no explanation for its abrupt change in policy. The agency cited no support for the bare assertion that "in the land border environment, exercising the 'highest degree of diligence' amounts to establishing a comprehensive security plan that would include" the

35

specific listed measures that were once proposed as a regulation but rejected in the notice-and-comment process.

In short, the agency's explanation for the imposition of penalties is not sufficient to enable the court to conclude that the CBP's actions were the product of reasoned decision-making. By failing to analyze the argument that UP was not subject to the penalties at all, the agency has failed to offer the rational connection between facts and judgment required to pass muster under the arbitrary and capricious standard.

## IV.  CONCLUSION

The court finds that the CBP acted outside its authority in assessing penalties under the Tariff Act. Further, the court finds that, if authorized, the CBP's actions would be arbitrary and capricious. [8]  Because the agency's assessment of these penalties on UP was not authorized and was undertaken without observance of proper procedure, the penalties must be set aside.

The seizure of the railcars under § 1594 is dependent on the proper assessment of penalties for unmanifested illegal substances under § 1584. Accordingly, the court finds that CBP should be enjoined from seizing railcars under 19 U.S.C. § 1594 in circumstances similar to those presented in this case. Accordingly,

IT IS ORDERED:

1. Union Pacific Railroad Company's motion for summary judgment (Filing No. 56 in 8:08CV336) is granted.

_____

[8]Ordinarily, agency actions that are arbitrary and capricious under the APA may also be arbitrary and capricious under the Constitution's substantive and procedural due process provisions. The court finds that grave constitutional concerns would arise if the court were to enforce CBP's interpretation of the statutes. In light of the court's disposition, the court need not further address the constitutional issues.

2.   The court declares that the fines levied against UP are null and void and unenforceable for the reasons set forth in this opinion.

3.   An injunction in conformity with this Memorandum and Order will issue this date.

4.   The United States' motion for judgment on the administrative record (Filing No. 120 in 8:08CV336) is granted. Judgment is entered in favor Union Pacific Railroad Company and against the United States.

5.   The decisions of Customs and Border Patrol are reversed and its assessments of penalties on Union Pacific Railroad Company are vacated.

6.   UP's motion to stay (Filing No. 124) is denied as moot.

DATED this 19th day of December, 2011.

                              BY THE COURT:


                              s/Joseph F. Bataillon
                              United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.